Toni Y. WILLIAMS, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant.

No. 98–700–Civ–Orl–18A.

United States District Court, M.D. Florida.

Sept. 22, 1999.

Robert Ginsberg, Law Offices of Robert Ginsberg, Daytona Beach, FL, Charles L. Martin, Law Offices of Charles L. Martin, Decatur, GA, for plaintiff.

Roberta M. Bahnsen, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Karen L. Gable, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, Mary Ann Sloan, General Counsel's Office, Atlanta, GA, for defendant.

### JUDGMENT IN A CIVIL CASE

SHARP, District Judge.

**Decision by Court.** This action came before the Court and a decision has been rendered.

### IT IS ORDERED AND ADJUDGED

That the Report and Recommendation entered by the United States Magistrate Judge is adopted by the Court and judgment is entered in favor of the Plaintiff, TONI Y. WILLIAMS, and against the Commissioner. The Decision of the Commissioner is REVERSED, the Plaintiff's Disability Benefits are to be reinstated, and this case is REMANDED to the Commissioner to make appropriate awards. The Plaintiff shall recover her costs of action from the Commissioner.

SPAULDING, United States Magistrate Judge.

### REPORT AND RECOMMENDATION
### TO THE UNITED STATES DISTRICT COURT

This cause came before the Court for consideration without oral argument on the Complaint filed by Toni Y. Williams ("Williams"), seeking review of the final decision of the Commissioner of Social Security terminating her claim for social security disability benefits. (Docket No. 1). The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Office of Hearings and Appeals of the Social Security Administration ("SSA"). (Docket Nos. 17 & 18). The matter has been referred to me pursuant to Middle District of Florida Local Rule 6.01(c)(21) for issuance of a report and recommendation.

### I. PROCEDURAL HISTORY.

In 1991, the SSA determined that Williams met Listing of Impairment 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03, due to schizophreniform disorder.[1] (TR. 154; 233). The SSA also recognized a secondary diagnosis of bronchial asthma. (TR. 154). In reaching this decision, the SSA relied on reports by Dr. Diamond from March 11, 1986, through September 15, 1991, and reports from ACT Corporation Mental Health Center ("ACT") from May 1, 1990, through September 30, 1991. (TR. 233). The SSA awarded Williams disability benefits under the Federal Old–Age, Survivors, and Disability Insurance program ("OASDI"), 42 U.S.C. § 401 *et seq.*, beginning May 18,

---

1. Schizophreniform disorder is identical to schizophrenia except that its symptoms last at least one month but less than six months. Symptoms include delusions, hallucinations, and flat affects. The diagnosis of schizophreniform disorder is made while the clinician waits for the symptoms to resolve. Patients with schizophreniform disorder return to their baseline level of functioning once the disorder has resolved. In contrast, for a patient to meet the diagnostic criteria for schizophrenia, the symptoms must have been present for at least six months. Harold I. Kaplan, M.D., Benjamin J. Sadock, M.D. Synopsis of Psychiatry 484, 506 (8th ed.1998).

1990, and supplemental security income under the Supplemental Security Income for Aged, Blind, and Disabled program ("SSI"), 42 U.S.C. § 1382 *et seq.*, beginning October 1, 1991. (TR. 222).

In 1992, the SSA reviewed Williams' continuing entitlement for OASDI and SSI benefits. (TR. 233). The only new information the SSA considered were reports from ACT from September 1991, through December 14, 1992. (*Id.*) Based on this review, the SSA determined that Williams' medical condition had improved so that she was "able to get along with others, understand and carry out simple instructions, use judgement, and care for [her] own needs." (*Id.*) It noted that her asthma was controlled with medication and that it did not limit her daily activities. (*Id.*) Therefore, it found that her disability ended in January 1993. (*Id.*)

Williams requested that the SSA reconsider its decision. (TR. 189). Disability hearing officer ("DHO") Maxine Gadson held a hearing on February 4, 1993. (TR. 199–208). The SSA requested a consultative examination by Malcolm Graham, Ph. D., and received his report dated February 10, 1993. (TR. 201, 220, 325–28). DHO Gadson also considered a report dated February 2, 1993, from ACT, and the testimony of Williams and her mother. (TR. 220).

The DHO determined that Williams was not engaging in substantial gainful activity at the time of the hearing. (TR. 213). She concluded that Williams had a severe impairment, but that her impairment no longer met Listing 12.03, due to medical improvement related to ability to work. (TR. 213–15). She also found that Williams could return to her past relevant work as a sales clerk and that she had the residual functional capacity to meet the mental demands of unskilled work. (TR. 216). Therefore, she concluded that Williams was not disabled. (TR. 225).

Williams' request for reconsideration of this decision was denied. (TR. 226–27).

Williams requested review of the decision by an administrative law judge ("ALJ"). (TR. 255). ALJ William T. Overton held a hearing on November 5, 1993. (TR. 82–105). Williams, who was represented by counsel, testified. (*Id.*) The ALJ also received into evidence exhibits 1 through 44 (TR. 151–358) and a Medical Residual Functional Capacity with Medical Assessment report from ACT dated November 9, 1993. (TR. 105; TR 361–66). ALJ Overton concluded that Williams was engaged in substantial gainful activity after she completed the trial work period.[2] (TR. 371). Therefore, he found that her disability ended in January 1993. (*Id.*)

ALJ Overton also noted that the evidence demonstrated medical improvement. (TR. 372). He noted that her schizophrenia was being treated by Cogentin and Haldol. Her treating psychiatrist at ACT, Victoria Dimayuga, M.D., stated that Williams' condition was "stable," noting on November 9, 1993, that "Client as long as complaint with medications can maintain stability to a certain degree." (*Id.*) ALJ Overton recognized that Williams' mental condition could deteriorate. He advised her to file another application for disability benefits should that occur. (TR. 372–73).

Williams asked the Appeals Council to review the ALJ's decision. (TR. 375). The request was granted. The Appeals Council vacated ALJ Overton's decision because it was not clear whether the termination of disability resulted from Williams' work or from an improvement in her medical condition. It remanded her case for another hearing. (TR. 381).

ALJ Ruben O. Figueroa scheduled the hearing on remand on September 2, 1994. (TR. 106–114). Williams asked for and received additional time to retain new counsel before the hearing was conducted. (TR. 113). ALJ Figueroa held the hearing

---

**2.** The Act permits a disabled individual to work for a limited time without losing disability benefits. 20 C.F.R. § 404.1592.

on January 6, 1995. (TR. 388). A transcript of the hearing is not in the record because the recording of the hearing was inaudible. (TR. 418). Based on the consultative examination by Dr. Graham and reports of Dr. Dimayuga, the ALJ concluded that Williams' mental condition had improved "to the point that her paranoid schizophrenic condition is at least in partial remission and fairly stable." (TR. 393). ALJ Figueroa recognized, as had ALJ Overton, that Williams' mental condition could deteriorate, but he determined that her current condition was stable enough for her to perform work activity. (*Id.*) Accordingly, he determined that Williams' disability ceased as of March 19, 1993. (TR. 398).

Williams asked that the Appeals Council review ALJ Figueroa's decision because the recording of ALJ Figueroa's hearing was not audible. (TR. 408). The Appeals Counsel granted her request and remanded her case for a new *de novo* hearing and decision. (TR. 418).

ALJ Figueroa held another hearing on March 12, 1997. (TR. 115–50). He received exhibits 1 through 61 and 63 in evidence. (TR. 120, 148–49, 151–463, 485–91). Williams, who was represented by counsel, testified, as did her mother, Lillian Williams. (TR. 123–48).

ALJ Figueroa again affirmed the cessation of disability based on medical improvement. (TR. 24). He determined that the comparison point decision date ("CPD")[3] was November 18, 1991. (TR. 16). The ALJ noted that the medical evidence supporting the original finding that Williams met Listing 12.03 was based on Dr. Dimayuga's diagnosis of schizophreniform disorder and severe depression. (TR. 20). Dr. Dimayuga based this conclu-

sion, in part, on Williams' visual hallucinations, inappropriate behavior, some paranoid delusions and fair to poor insight and judgment. (*Id.*) After the CPD, the ALJ found that the ACT records reflected that Williams reported "doing well" with limited reports of ideas of reference and paranoid ideation, although she reported some anxiety due to pressure. (TR. 20–21). Dr. Graham found in his consultative psychological evaluation that Williams had paranoid schizophrenia, which was in partial remission. (TR. 21). Dr. Graham also noted that if Williams maintained her medication regimen, she remained fairly stable. (*Id.*) Based on these medical records, ALJ Figueroa found that there had been an improvement in Williams' medical condition related to her ability to perform work-related activities. (TR. 22).

Using the Psychiatric Review Technique Form, ALJ Figueroa determined that Williams met the requirements of Listing 12.03(A), "Psychotic features and deterioration that are persistent (continuous or intermittent), as evidenced by at least one of the following: ... Delusions or hallucinations." (TR. 30). He did not find that Williams met any of the functional limitations of Listing 12.03(B).[4] He did not complete the portion of the report pertaining to Listing 12.03(C) relating to "Disorder (Schizophrenic, etc.) and in Full or Partial Remission." (TR. 32). In his "Findings," he stated that Williams did not have an impairment or combination of impairments meeting any of the Listing of Impairments. (TR. 27).

ALJ Figueroa reviewed Williams' other medical complaints. He determined based on the medical records that she did not suffer from disabling bronchial asthma be-

---

3. To determine whether disability ceased, the fact finder must compare the medical evidence supporting the most recent final decision holding that the claimant is disabled with medical evidence of the claimant's condition after the date of that decision. Vaughn v. Heckler, 727 F.2d 1040, 1043 (11th Cir.1984). This comparison point is called the comparison point decision date. 20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii).

4. The form used by the ALJ has an "*" next to the summary categories that are sufficient to satisfy the listings. This indication was not included on the forms completed by Dr. Bates or Dr. Dimayuga.

fore or after the CPD. (TR. 22). However, Williams could not work in environments exposing her to excessive concentrations of lung irritants. He noted that Williams suffered a cervical and lumbar strain as a result of a motor vehicle accident in March 1992, after the CPD. A physical functional capacity evaluation in December 1992, reflected that she could do light work. (*Id.*)

Focusing on Williams' mental functional capacity, ALJ Figueroa concluded, based on the Psychiatric Review Technique Form, that Williams had only a slight restriction of her activities of daily living due to her mental impairment. (TR. 30–33). ALJ Figueroa noted that Williams worked on an almost constant basis from November 1991, through October 1994, and that she was working again in late 1996. (TR. 23). He found this work activity inconsistent with Dr. Dimayuga's mental residual functional capacity assessment of November 9, 1993, indicating Williams had moderate limitations in maintaining regular attendance and sustaining an ordinary routine and other limitations in completing a normal workday and responding appropriately in work settings. He also found Dr. Dimayuga's medical assessment of the same date to "differ dramatically" from her mental residual functional capacity assessment because it reflected fair mental functioning in almost all areas. (TR. 23). The ALJ, therefore, did not "assign any determinative weight to either assessment." (*Id.*)

Based on Williams' work history, ALJ Figueroa concluded that "she was able to relate satisfactorily in order to complete her work activity." (TR. 23). He also found that she had only "slight difficulties in social functioning," noting that the reports reflected Williams liked to go to the mall and shopping when she was not working. (TR. 23–24). Although Williams testified that she still encountered difficulty in concentration and persistence, the ALJ noted that she had not experienced any

episodes of deterioration or decompensation.[5] (TR. 24). Therefore, he concluded that she had a "non-severe [mental] impairment." (*Id.*)

ALJ Figueroa found Williams' testimony about her exertional and non-exertional impairments to be inconsistent with her work history and her activities at home. (TR. 26). He determined that she retained the residual functional capacity to perform light work that did not expose Williams to lung irritants. (*Id.*) Because he concluded that her mental impairments were not severe, he found that these impairments would not significantly affect her ability to work. (*Id.*)

The ALJ found that both Williams' work as a sales clerk and as an assistant to a blind student were light work. (TR. 27). He concluded, therefore, that as of early 1993, Williams was not disabled because she could have returned to her past relevant work. (*Id.*)

Williams appealed the ALJ's decision to the Appeals Council, which denied review on April 16, 1998. (TR. 6). Williams timely sought review of this decision by the United States District Court on June 17, 1998. (Docket No. 1).

## II. JURISDICTION

The Commissioner of Social Security issued a final decision after a hearing with respect to Williams' application for OASDI and SSI benefits. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III. STATEMENT OF FACTS

*A. Nature of the Claimed Disability.*

The SSA initially awarded benefits to Williams based on its finding that she was disabled by a schizophreneform disorder, later determined to be paranoid schizo-

---

5. Despite the Appeal Council's instruction to base the decision on remand on a new *de novo* hearing, ALJ Figueroa considered Williams' testimony at the January 6, 1995, hearing, which could not be transcribed because the hearing was inaudible. (TR. 24–25).

phrenia. As a result of an automobile accident in 1992, Williams suffered lumbar and cervical strain. Williams has also been treated for bronchial asthma.

### B. Summary of the Evidence Before the Administrative Law Judge .

#### 1. Testimony of Williams and Her Mother.

At the time of the second hearing before ALJ Figueroa, Williams was 39 years old. (TR. 123). She was a single woman with a college degree living with her mother. (TR. 124–25). Williams testified that her most severe problem was her mental instability, including inability to concentrate and reason. (TR. 92). She expressed an inability to deal with public situations. (TR. 92). She testified she continued to have hallucinations, and she believed people were trying to harm her, follow her, or contact her through the television. (TR. 96, 100–02). Her concentration was poor. (TR. 103). She testified she had sleeping difficulty caused by pain and nerve problems. (TR. 102–03). She indicated she cried all night. (TR. 130). Williams was being treated with the drug Haldol three times a day, which Williams indicated slowed her down considerably, impaired her ability to think and concentrate and made her weak.[6] (TR 141, 463). Williams' mother testified that Williams suffered a nervous breakdown in 1990, her daughter's condition was deteriorating, and she believed Williams would need to be institutionalized eventually. (TR. 24). Williams also complained of muscle spasms and bronchial asthma. (TR. 92).

**6.** From March 1990 to February 19, 1997, Williams' medications included Cogentin·and Haldol for schizophrenia, Asthma Cort and Seldane for asthma, and Tylenol or Motrin for pain. (TR. 463).

**7.** Ideas of reference include a person's belief that the television or radio is speaking to or about him or her. Harold I. Kaplan, M.D., Benjamin J. Sadock M.D., Synopsis of Psychiatry 252 (8th ed.1998).

### 2. Mental Impairment.

### (a) Medical Evidence Supporting Original Finding That Williams Met Listing 12.03.

Dr. Victoria Dimayuga, Williams' treating psychiatrist at ACT, noted, on May 1, 1990, that Williams was acting somewhat inappropriately, including occasionally blurting out silly laughter. (TR. 298). She demonstrated paranoid delusions and referred to a conspiracy within the school system to prevent her from getting ahead. (Id.) Williams believed rooms everywhere were bugged, including the location where her psychiatric interview took place. (Id.) She contacted the phone company because she believed her telephone was bugged. (TR. 293). She had a feeling people were trying to put rat poison in her food. (TR. 298). She had ideas of reference [7] and her affect was inappropriate to situation and ideation. (Id.) Her insight and judgment were fair to poor. (Id.)

Dr. Dimayuga's impressions were that Williams had schizophreniform disorder, rule out paranoid schizophrenia. (Id.) She had a Global Assessment of Function of 40–50.[8] (Id.) Dr. Dimayuga prescribed a tranquilizer to remove psychosis and advised Williams to take a leave of absence from work. (Id.) Dr. Dimayuga indicated that if Williams' psychosis escalated any further she would hospitalize her. (Id.)

Dr. Dimayuga saw Williams several times between May 1990, and September 30, 1991. (TR. 282–96). On May 8, 1990, Williams was not experiencing visual hallucinations. She appeared to be improving, although she still exhibited a blunt affect and had "vestiges of paranoia." (TR. 296). On May 15, 1990, Williams' speech was

**8.** A rating of 40 to 50 suggests serious symptoms or serious impairment in social, occupational or school functioning, or even some impairment in reality testing or communication. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Rev.1994) (DSM–IV).

clear and coherent, but she still had paranoid delusions and ideas of reference. (TR. 295). On June 5, 1990, Williams' affect was neutral and appropriate. She was less delusional, less paranoid and appeared to be stabilizing due to medication with Haldol and Cogentin. (TR. 289). However, on August 8, 1990, her affect was again blunt, and she suffered from paranoia but not visual hallucinations. (TR. 288). On October 15, 1990, Williams stated that she was increasingly getting paranoid. She admitted to skipping doses of her medication. She again had paranoid ideations and was referencing another conspiracy at her school. Dr. Dimayuga encouraged Williams to take her medication as prescribed and suggested taking a break from work. (TR. 287).

On January 22, 1991, Williams complained of drowsiness from the medication. She fell asleep at work and lost her job. Williams said that she was depressed from losing her job, but Dr. Dimayuga noted that she did not have any ideations and that her insight and judgment were good. (TR. 285). On April 15, 1991, Dr. Dimayuga noted that Williams' affect was neutral and appropriate with no visual hallucinations. Williams denied ideations. Nevertheless, Dr. Dimayuga described her dominant character structure as paranoid. She noted that Williams was stabilizing on the medications, Haldol and Cogentin, without side affects. (TR. 284). A Service/Treatment Plan update dated May 25, 1991, reflected that Williams was stable and working part-time as a substitute teacher. (TR. 294). On September 30, 1991, Williams again had a blunt affect, but she was not having visual hallucinations. Dr. Dimayuga noted that Williams asked to go on disability because she was having difficulty finding a job. She continued to describe Williams' dominant character structure as paranoid. (TR. 282).

**(b) Medical Reports After Comparison Point Decision Date of November 18, 1991.**

On December 31, 1992, Henry D. Bates, Ph.D., an SSA non-examining psychologist, completed an SSA form entitled "Mental Residual Functional Capacity Assessment." (TR. 244–46). The instructions on the form asked for summary conclusions by checking boxes labeled "Not Significantly Limited," "Moderately Limited," "Markedly Limited," "No Evidence of Limitation in this Category," and "Not Ratable," which terms are not defined on the form. The form requested that detailed explanations of the degree of limitation marked, and any other assessment information, be recorded in the Functional Capacity Assessment section of the form.

Dr. Bates did not find any evidence in the file reflecting that Williams had any limitation in the following areas: ability to understand and remember detailed instructions; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors, ability to respond appropriately to changes in the work setting and ability to set realistic goals or make plans independently of others. He found that she was not significantly limited in all other categories, except the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods, which he marked moderately limited. In the "Functional Capacity Assessment" portion of the form, Dr. Bates stated as follows:

> In treatment and doing well. Completed trial work period.... Still shows some social withdrawal and some delusional ideas regarding TV, but can interact appropriately with others, drive car and follow and recall oral instructions. Can perform routine repetitive tasks on ongoing basis.

(TR. 246).

Dr. Bates also completed the SSA form entitled "Psychiatric Review Technique."

His medical summary was schizophrenia, and he checked the box for Listing 12.03. (TR. 247). In documenting the factors evidencing schizophrenic, paranoid and other psychotic disorders, Dr. Bates checked the box indicating, "[p]sychotic features and deterioration that are persistent (continuous or intermittent), as evidenced by at least one of the following...". (TR. 249). He then checked the box indicating "absent" for the category describing "[d]elusions or hallucinations," but underlined "delusions." (*Id.*) He indicated all other symptoms related to psychotic disorders which were itemized on the form were absent. (*Id.*)

He noted that at the CPD, Williams experienced "hallucinations, delusions, ideas of reference; phone, TV and classroom bugged, ideas of mind control, pacing, blunt affect, somatic preoccupation, conspiracy ideas." (TR. 248). As of December, 1992, Dr. Bates found that the evidence in the file reflected the following: "Appropriate affect, coherent, patient states she is ok, but says TV directing messages at her personally.... Doing well, works part-time at Sears." (*Id.*) Due to her mental disorder, Dr. Bates found a slight limitation on activities of daily living, a moderate limitation in maintaining social functioning, that Williams often suffered deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner but no episodes of deterioration or decompensation in work or work-like settings. (TR. 254). The form does not define the terms "slight," "moderate," or "often." Dr. Bates concluded that these limitations did not meet any of the categories in Listing 12.03(B). (*Id.*)

In February 1992, Dr. Dimayuga noted in an ACT Medication Clinic Status Report that Williams' dominant character structure was paranoid. (TR. 329). She observed that Williams still had ideas of reference and believed the television sent her communications. (*Id.*) At that time, Williams was working part-time at Sears, from 6:00 p.m. to 9:00 p.m. (*Id.*) Williams had a difficult time unwinding from work

which caused her to have difficulty sleeping. (*Id.*) Consequently, Williams was sleeping during the day. (*Id.*) On March 27, 1992, Dr. Dimayuga observed that Williams was doing well, without side effects from the medication. (TR. 303). On June 15, 1992, Williams was again having ideas of reference, occasionally hearing voices, even though she was taking her medication as directed. (TR. 302). Williams admitted to recurrent vague suspicious thoughts on September 23, 1992. (TR. 301). Williams stated that she believed the television occasionally directed messages at her personally on December 14, 1992. She stated that she was working part-time for the holidays. (TR. 300).

In February 1993, Dr. Dimayuga stated that Williams required regular intake of medication and follow-up visits at the clinic to keep her stable. She noted that Williams had been unable to "hold a steady job" or "tolerate long hours." (TR. 299). On May 11, 1993, Williams still had a blunt affect and experienced ideas of reference and paranoid ideation. (TR. 356–57). These ideas of reference continued in December 1993, when Williams reported that the television sometimes broadcast things about her. At that time, Williams was working part-time but felt pressured by a supervisor's requirement that everyone compete and meet a quota. Dr. Dimayuga still defined Williams' dominant character structure as paranoid. (TR. 355).

In November 1993, Dr. Dimayuga completed the same SSA form entitled "Mental Residual Functional Capacity Assessment" completed by Dr. Bates almost one year earlier, which asked about Williams' ability to perform various mental activities over a normal workday and work week on an ongoing basis. (TR. 361–66). In the summary conclusions, Dr. Dimayuga indicated that Williams was not significantly limited in most categories. She noted that Williams had moderate limitations of ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special super-

vision; complete a normal workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest period; accept instructions and respond appropriately to criticism from supervisors; and respond to changes in the work setting. (TR. 361–62). In the Functional Capacity Assessment portion of the form, Dr. Dimayuga explained these summary conclusions as follows:

Client has recurrent bouts of paranoid ideation and occasionally has experienced auditory hallucinations. She requires monitoring and titration of medications. She has difficulty handling complex instructions, easily stressed by increase in work load or easily confused when instructions are given by more than one supervisor.

(TR. 363).

Dr. Dimayuga also completed a form entitled "Medical Assessment Of Ability To Do Work Related Activities (Mental)." (TR. 364–66). The instructions in this section of the form ask for an assessment of how Williams' mental and emotional capabilities are affected by the impairment. The form defined the summary conclusions as follows:

*Unlimited or Very Good* —Ability to function in this area is more than satisfactory.

*Good* —Ability to function in this area is limited by satisfactory.

*Fair* —Ability to function in this area is seriously limited, but not precluded.

*Poor or None* —No useful ability to function in this area.

The doctor was instructed to identify particular medical or clinical findings supporting any limitations.

Dr. Dimayuga rated Williams' ability to function as "fair" in all categories under "Making Occupational Adjustments," specifically: follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisor(s); deal with work stresses; function independently; maintain attention/concentration; understand, remember and carry out simple job instructions; relate predictably in social situations; and demonstrate reliability. (TR. 364–65). In support of these limitations, Dr. Dimayuga noted Williams' recurrent paranoid ideations and actual auditory hallucinations. (TR. 365).

Under the heading "Making Performance Adjustments," Dr. Dimayuga indicated Williams had average intelligence and could understand and carry out simple job instructions. She rated her ability to "Understand, remember and carry out simple job instructions" as fair, due to "[r]ecurrent paranoid ideations and perceptual disturbances [which] limit her task performance." (TR. 365).

In response to the questions pertaining to "Making Personal–Social Adjustments," Dr. Dimayuga rated Williams unlimited/very good in maintaining personal appearance, good in behaving in an emotionally stable manner, but only fair in relating predictably in social situations and demonstrating reliability. (TR. 365). Again, Dr. Dimayuga cited Williams' paranoid ideations and actual auditory hallucinations. (TR. 366). With respect to "Other Work–Related Activities," Dr. Dimayuga noted that Williams was "unable to handle complex instructions, easily stressed by increase in work load or one too many supervisors giving her instructions." (*Id.*) She stated that Williams could manage her benefits as long as she took her medications as directed and maintained stability to a certain degree. (*Id.*)

On February 10, 1993, a consultative evaluation was conducted by Malcolm J. Graham, Ph.D., a clinical psychologist. On mental status examination, Dr. Graham noted that Williams' "affect did appear to be flat and blunted." (TR. 326). Her concentration was impaired in that "[s]he could not accurately count backward from 20 to 1 and became confused after she reached 11 and began to count forward." (*Id.*) "She could say her ABC's in 5 seconds without error" but "[s]he became confused when trying to count forward by three's and made multiple errors on this

task." (*Id.*) Dr. Graham's diagnosis was schizophrenia, paranoid type, in partial remission. (TR. 327). He concluded that Williams' prognosis was guarded. (*Id.*) He noted that although Williams was taking appropriate medication for "an acute psychotic episode in the relatively recent past" and appeared to be "able to maintain herself out of the hospital," "[t]here seems to still be some delusional material ... primarily when she watches television." (TR. 326–28). He rated her Global Assessment of Function at 60 to 65.[9] (*Id.*)

### 3. *Physical Impairments.*

Williams was treated with allergy injections and medications for bronchial asthma by Dr. Michael Diamond. (TR. 267–81, 316–17, 485–91). On September 16, 1991, Dr. Diamond observed that Williams had "done well" since receiving medication for her asthma. (TR. 272). On February 7, 1996, he recommended that Williams not work where she would be exposed to dust. (TR. 488).

Williams was treated by Dr. Ortolani, a neurologist, for complaints of neck and back pain. On March 13, 1992, Dr. Ortolani's records show that Williams sustained a whiplash type injury in an automobile accident which produced a significant amount of restriction of flexion, extension and rotation of the cervical spine, paracervical muscle tenderness and spasms. (TR. 310). She was diagnosed with cervical strain of moderate severity. (TR. 311). Treatment included sessions with a chiropractor and the medications Soma and Darvocet. (*Id.*) Williams continued to complain of pain, but both an MRI and EMG test were normal. (TR. 307). A functional capacity evaluation performed by Rachel Owens, M.D. on December 12, 1992, placed Williams in the light work classification. (TR. 464). Dr. Ortolani reported that her neck was improved, but she continued to need treatment for back and neck pain. (TR. 341, 482, 484).

### 4. *Employment History.*

#### (a) Williams' Employment Prior to the CPD.

Williams worked as a tutor at Daytona Beach Community College from 1979 to 1981 for $200 per week. (TR. 155). She worked as a teacher in 1980 and 1981 at $17,500 annually according to her vocational report. (*Id.*) From 1981 to 1985, her rate of pay as a teacher increased to $18,000 annually. (TR. 155). Williams worked as a substitute teacher from 1985 until 1990 at $50 per day. (*Id.*) Williams began working at Sears part-time in November 1990, where she made from $235 to $665 a month. (TR. 88, 349).

#### (b) Williams' Employment After the CPD.

The SSA determined that Williams' work fell below the level of substantial gainful activity in October 1992, so her benefits continued. (TR. 242). Williams continued to work at Sears until February 6, 1993, when she was terminated because she had a personal problem with her supervisor. (TR. 209, 349). Beginning in April 1993, Williams worked at Burdines. Burdines fired her in June 1993; Williams believed she was fired because she was moving too slowly. (TR. 88, 358). She earned gross total earnings of $1,637.39. (TR. 358). Williams testified that she was unable to perform these jobs adequately because she was not able to concentrate and tolerate stress. (TR. 97). She also was concerned about operating the registers because of her mental problems and her nerves. (TR. 129).

Williams worked at the Conklin Center assisting blind students from September 1993, until October 1994, when the center fired her for being verbally abusive toward a student. (TR. 89, 440, 442, 128). She earned $5.00 per hour at the Conklin Center.[10] (TR. 442). Williams testified that

---

**9.** A rating of 61–70 suggests mild symptoms or some difficulty in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders (4th ed.)

(DSM–IV). Williams' rating of 60–65 suggests somewhat more difficulty in these areas.

**10.** Williams' FICA earnings statement shows earnings of $6076 for 1992, $4927 for 1993,

during the course of her employment at the Conklin Center she would forget the things for which she was responsible. (TR. 87).

Williams' next job, beginning in early 1996, was caring for an elderly patient in his home for three or four hours per day, five days per week at $110 per week. (TR. 126–27, 462). She indicated that the job was too much for her, and she took off so many days that she was terminated. (TR. 129). However, her employer eventually called her to come back to work because she was unable to find a replacement. (TR. 130). Williams returned for a couple hours per day. (*Id.*)

## IV. STANDARD OF REVIEW

■ After an individual is awarded disability benefits by the SSA, those benefits will cease upon a showing that there has been medical improvement related to the ability to work. 42 U.S.C. § 423(f); 42 U.S.C. § 1382c(a)(4); *Simpson v. Schweiker,* 691 F.2d 966, 969 (11th Cir.1982). Benefits may also be suspended if an individual is currently engaging in substantial gainful activity. 20 C.F.R. § 416.994(b)(3) & (4); 20 C.F.R. § 404.1594(d) & (e). When the substantial gainful activity ends, the disability continues if the individual has not experienced medical improvement. *Powell v. Heckler,* 773 F.2d 1572, 1576 (11th Cir.1985). A person otherwise disabled under OASDI who manages to secure employment will pass into and out of eligibility for benefits when ceasing or embarking upon substantial gainful activity. *Id.*

■ "[O]nce the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling.... The presumption of a continuing disability does not affect the ultimate burden of proof. It imposes on the [SSA] only the burden of going forward with evidence to rebut or meet the presumption..... Once the burden to come forward has shifted to the SSA, the Secretary must present evidence that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity." *Daring v. Heckler,* 727 F.2d 64, 68–69 (3d Cir. 1984) (quoting *Kuzmin v. Schweiker,* 714 F.2d 1233, 1237 (3d Cir.1983)).

■ Comparison of original medical evidence and new medical evidence is necessary to make a finding of improvement. *Vaughn v. Heckler,* 727 F.2d 1040, 1043 (11th Cir.1984). The point of comparison is the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether claimant was disabled or continued to be disabled. 20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii).

Medical improvement is assessed by review of "symptoms, signs and laboratory findings." 20 C.F.R. § 416.994(b)(1)(i); 20 C.F.R. § 404.1594(b)(1). Symptoms are the claimant's description of impairments. 20 C.F.R. § 416.928; 20 C.F.R. § 404.1528. Signs are observable by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are from medically acceptable laboratory techniques. *Id.*

■■ The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen,* 841 F.2d 1077, 1080 (11th Cir.1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales,* 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence is more than a scintilla, and it must do more than create a suspicion of the existence of the fact to be established; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Walden v. Schweiker,* 672 F.2d 835, 838–39 (11th Cir.1982).

$9033 for 1994, $5476 for 1995, and no earnings for 1996 and 1997. (TR. 265).

 The court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Walker v. Bowen,* 826 F.2d 996, 1000 (11th Cir.1987). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *Allen v. Schweiker,* 642 F.2d 799, 800 (5th Cir.1981); *see also Harwell v. Heckler,* 735 F.2d 1292 (11th Cir. 1984); *Martin v. Sullivan,* 894 F.2d 1520 (11th Cir.1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Martin,* 894 F.2d at 1529. While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusions about the proper standards to be applied in evaluating claims. *Welch v. Bowen,* 854 F.2d 436, 438 (11th Cir.1988); *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir.1986).

## V. ANALYSIS

Williams asserted that the finding that her mental impairment no longer meets Listing 12.03 was erroneous. Medical improvement alone does not justify termination of benefits if the claimant still meets the Listing. 20 C.F.R. § 416.994; 20 C.F.R. § 404.1594.

Listing 12.03, addressing schizophrenic, paranoid and other psychotic disorders, provides as follows:

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:

 1. Delusions or hallucinations; or

 2. Catatonic or other grossly disorganized behavior; or

 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

 a. Blunt affect; or

 b. Flat affect; or

 c. Inappropriate affect; or

 4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

 1. Marked restriction of activities of daily living;[11] or

 2. Marked difficulties in maintaining social functioning;[12] or

 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere);[13] or

 4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors);

OR

C. Medically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements in A and B of this listing, although these symptoms or signs are currently attenuated by medication or

---

11. "Marked" is defined as the overall degree of interference in a particular area or combination of areas of functioning. A hostile person, for example, may be tolerated but may have marked restrictions because that behavior is not socially acceptable. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B)(2).

12. Social functioning refers to an individual's capacity to interact appropriately and com-municate effectively with others. Impaired social functioning may be demonstrated by a history of firings. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B)(2).

13. Concentration, persistence and pace refer to the ability to sustain focused attention sufficiently long to permit the timely completion of tasks in work settings. 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.00(B)(3).

psycho-social support, and one of the following:

1. Repeated episodes of deterioration or decompensation in situations which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms (which may include deterioration of adaptive behaviors); or

2. Documented current history of two or more years of inability to function outside of a highly supportive living situation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

There are two ways to meet Listing 12.03. "First, the claimant can show the existence of certain symptoms associated with schizophrenia (the paragraph 'A' criteria), plus the existence of two of more functional impairments at a stated level of severity (the paragraph 'B' criteria).... Alternatively, the claimant can prevail by satisfying the paragraph 'C' criteria. This entails showing that [the claimant] ... at one time in the past satisfied the criteria of paragraphs 'A' and 'B,' that her symptoms are currently attenuated by treatment, and that she has either a history of repeated episodes of deterioration or a recent, prolonged period of inability to function." *Pagan v. Bowen*, 862 F.2d 340, 343 (D.C.Cir.1988). The paragraph "C" criteria were added to the Listing "to ensure that the chronic schizophrenic individual who may have his or her symptoms attenuated by treatment but who still cannot work because of more subtle manifestations of his or her disorder will now meet the severity of the revised listing." *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C.Cir. 1987).

The SSA originally determined that Williams' mental condition met Listing 12.03 based on psychiatric evaluations by her treating psychiatrist, Dr. Victoria Dimayuga. Among other things, Dr. Dimayuga noted that Williams demonstrated paranoid delusions, ideas of reference, her affect was inappropriate to situation and ideation, and her insight and judgment

were fair to poor. Dr. Dimayuga rated Williams at a global assessment of function of 40–50. Dr. Dimayuga treated Williams with medication, which helped to attenuate her symptoms. From May 1, 1990, through November 18, 1991, Williams was able to work part-time.

The ALJ found that Williams' disability ended because her medical condition improved to the extent that she no longer had a severe mental impairment. The ALJ correctly recognized the medical improvement standard in evaluating whether Williams' benefits should be terminated. Likewise, the ALJ correctly utilized November 18, 1991, as the comparison point decision date for the medical improvement. He also reviewed the criteria of paragraphs "A" and "B" of Listing 12.03 in his Psychiatric Review Technique Form. However, ALJ Figueroa did not discuss whether Williams' condition, in light of the medical improvement, met paragraph "C" of Listing 12.03.

The first requirement of paragraph "C" is that Williams had a "[m]edically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements in A and B of this listing, although these symptoms or signs are currently attenuated by medication or psycho-social support." This requirement was established by the SSA's original decision that Williams met Listing 12.03.

The next requirement of paragraph "C" is that Williams had a functional limitation associated with the mental illness. The functional limitation can be established through evidence of repeated episodes of deterioration or decompensation or a documented history of two or more years of inability to function outside of a highly supportive living situation. In contrast to paragraph "B.4.," paragraph "C.1." does not require that the episodes of deterioration or decompensation take place in work or work-like settings. *Esselstrom v. Chater*, 67 F.3d 869, 872 (9th Cir.1995). There is also no requirement that these episodes

last a specific period of time. *Pagan*, 862 F.2d at 346.

Both the consulting psychologists and Williams' treating psychiatrist acknowledged that Williams had repeated episodes of deterioration after November 18, 1991. Dr. Bates stated in December 1992, that Williams "[s]till shows some social withdrawal and some delusional ideas regarding TV." He stated that Williams "often" suffered deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner.[14] Dr. Graham noted on February 10, 1993, that Williams had "an acute psychotic episode in the relatively recent past." He found that her concentration was impaired and that her affect was flat and blunted. He concluded that her paranoid schizophrenia was in partial remission and that the prognosis was guarded.

The treatment records from Dr. Dimayuga, Williams' treating psychiatrist, document many episodes of deterioration and decompensation after November 18, 1991. In February 1992, Williams had ideas of reference, believing that the television sent her communications. In March 1992, she appeared to be symptom-free. However, by June 1992, Williams was against having ideas of reference, occasionally hearing voices. She reported vague suspicions in September 1992, and that she believed the television was still directing messages to her in December 1992. Williams continued to experience ideas of reference in May and December 1993. Dr. Dimayuga observed in November 1993, that Williams had "recurrent bouts of paranoid ideation and occasionally [has] auditory hallucinations."

The ALJ acknowledged that Williams had moderate difficulties in social functioning and that she experienced deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, albeit "seldom," after the CPD.[15] He determined that these episodes were not sufficiently severe to meet the requirements of Listing 12.03(B). However, the episodes of deterioration or decompensation need not be severe to meet the requirements of Listing 12.03(C). Rather, paragraph "C" "expressly recognize[s] that the threat of future episodes, coupled with the presence of mild symptoms between episodes, imposes a continuing 'functional restriction' on an individual." *Pagan*, 862 F.2d at 348.

The ALJ cited Williams' work history as evidence of her mental function-

14. He added that none of these deficiencies were in work or work-like settings. (TR. 254).

15. He rejected Dr. Dimayuga's determination that these episodes met Listing 12.03(B) because Dr. Dimayuga rated these deficiencies as "moderately limited" on one medical residual functional capacity assessment and "fair" on another. Under the regulations governing use of the Psychiatric Review Technique Form ("PRTF"), moderate limitations on social functioning are not sufficiently severe to be incompatible with the ability to work, 20 C.F.R. § 404.1520a(b)(3), but having only a "fair" ability to function socially would be sufficiently severe to be incompatible with the ability to work, *see* Harvey L. McCormick, Social Security Claims and Procedures, Fourth Edition § 682 (Supp.1997) (" 'Fair,' as used in mental assessment forms designed to determine disability benefits claimant's ability to do work-related activities on a day-to-day basis in regular work setting, is essentially the same as listing requirements' definition of 'marked,' which represents the degree of disability that satisfies two of four listing requirements"). No legal authority was presented that the levels of severity associated with the PRTF applied to the forms Dr. Dimayuga completed. No evidence was presented that Dr. Dimayuga knew how the SSA interpreted the summary categories on the forms she completed. Accordingly, the ALJ erred in failing to consider these reports without seeking clarification from Dr. Dimayuga. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) ("An Administrative Law Judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless 'good cause' is shown to the contrary"); *Broughton v. Heckler*, 776 F.2d 960, 961–62 (11th Cir.1985) ("[T]he opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable period of time, should be accorded considerable weight"); 20 C.F.R. § 404.1512(e)(1).

al capacity. "[M]ere ability to attempt employment during some symptom-free intervals does not negate disability, at least for periods of inability to work. In particular, the [SSA] should consider both the length of time on the job and the reasons for leaving, as well as 'the likelihood, frequency, and severity of relapses in [claimant's] ... mental illness.'" *Poulin,* 817 F.2d at 876. Moreover, "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986).

In *Ambers v. Heckler,* 736 F.2d 1467, 1468 (11th Cir.1984), the United States Court of Appeals for the Eleventh Circuit held that a claimant who met the listing for mental retardation was "entitled to benefits regardless of the fact that she may be able to hold gainful employment...." It based this holding on 20 C.F.R. §§ 404.1520(d) and 416.920(d), which provide that if an individual's impairment meets a Listing, "we will find (the claimant) disabled." *Id.* at 1469. Therefore, "[e]mployment acts, in essence, to bar benefits to otherwise eligible claimants for the duration of employment." *Powell,* 773 F.2d at 1576. Under this standard, Williams' ability to work sporadically did not undermine the original determination that she met Listing 12.03. Rather, she merely would not be entitled to receive benefits during any periods of employment that rise to the level of substantial gainful activity.

There is substantial evidence that Williams was unable to hold a job for a significant period. After the CPD, she never worked at a level commensurate with her college degree. She worked part-time at Sears until February 6, 1993, although her work fell below the level of substantial gainful activity in October 1992. She worked three months at Bur-

dines before being terminated. Williams testified that she was not able to concentrate and tolerate the stress of the job. While working at Burdines, her mental condition deteriorated; she against experienced paranoid ideation and ideas of reference. She worked for a year at the Conklin Center, from September 1993 through October 1994, before being fired for being verbally abusive toward a student. During this time, she again experienced episodes of paranoia and ideas of reference, including the impression that the television was directing messages to her. She did not work again until 1996, and then only briefly. This pattern of sporadic employment is consistent with other reported cases of sporadic work by individuals suffering from chronic schizophrenia. *See, e.g., Leidler v. Sullivan,* 885 F.2d 291 (5th Cir.1989); *Poulin v. Bowen,* 817 F.2d 865 (D.C.Cir.1987); *Powell v. Heckler,* 773 F.2d 1572 (11th Cir.1985).

In 1993, Dr. Dimayuga, who had treated Williams since 1990, indicated that Williams was not stabilized to the point that she could hold a steady job or tolerate long hours. She also observed that Williams had difficulty handling complex instructions, was easily stressed by an increase in work load and had moderate limitations in her ability to maintain regular attendance and respond to changes in the work setting. In addition, she noted that Williams' recurrent paranoid ideation limited her task performance. There is, therefore, substantial evidence in the record before the Court that Williams met Listing 12.03(C) despite her medical improvement.

The Commissioner asked the Court to remand the case for a fourth administrative hearing if it determined that the ALJ's decision was not supported by substantial evidence. Remand is not required when the record below has been fully developed. The *Esselstrom* court's conclusion in another case involving a claimant who met Listing 12.03(C) is equally applicable here. "There is no rea-

son to require [the claimant], who has waited for benefits for over four [16] years, to continue to wait for benefits. On the contrary, the record bespeaks disability. Thus, we exercise our discretion to order an award of benefits." 67 F.3d at 874.

## VI. RECOMMENDATION

Based on the absence of substantial evidence supporting the ALJ's decision that Williams no longer met listing of impairment 12.03, I respectfully recommend that the decision of the Commissioner be REVERSED. Because substantial evidence in the record supports the conclusion that Williams continued to meet Listing 12.03 at the time her disability benefits were terminated, and because the SSA failed to evaluate whether Williams met the criteria of Listing 12.03(C) despite three administrative hearings, I also recommend that the Court order that disability benefits to Williams be reinstated and that the Court REMAND the case to the Commissioner to make appropriate awards not inconsistent with this opinion.

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

Respectfully recommended in Orlando, Florida on this 12th day of August, 1999.

---

16. In Williams' case, six years.