**Rosa WHETSTONE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 02–M–677–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

March 3, 2003.

R. Michael Booker, Birmingham, AL, for plaintiff.

Martha Ann Miller, Leura Garrett Canary, Montgomery, AL, for defendant.

## ORDER

McPHERSON, United States
Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), the claimant, Rosa Whetstone ("Whetstone"), brings this action to review a final decision by the Commissioner. The Commissioner denied the continuation of claimant's claims for Supplemental Security Income ["SSI"] and Disability Insurance Benefits (Doc. # 1). Based upon the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner should be AFFIRMED.

## I. PROCEDURAL HISTORY AND FACTS

Whetstone was born on 5 February 1958 and was 42 years old at the time of the administrative hearing (R. 42). She completed the eighth grade (R. 42) and temporarily worked for Central Alabama Nursing Service where she sat with patients (R. 45).

On 3 May 1993, Whetstone filed an application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and for Supplemental Security Income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (R. 107–09). Following an administrative review[1], the Administrative Law Judge ["ALJ"] granted Whetstone's request for benefits in a decision dated 3 August 1994 (R. 218–225). The ALJ found that Whetstone was disabled as of 8 March 1993, due to severe impairments, including multiple stab wounds to the chest, residual ventricular septal defect, shortness of breath, dyspnea[2], dizziness and generalized anxiety disorder (R.218–225).

On 22 July 1999, the Social Security Administration notified Whetstone that, as of July 1999, she was no longer "disabled" as defined by the Social Security Act because her health had improved and she was now able to work (R. 241–44). After a second administrative review, the ALJ denied Whetstone's request for a continuation of benefits in a decision dated 6 April 2001 (R. 18–37). On 12 April 2002, the Appeals Council denied Whetstone's request for review (R. 6–8). Therefore, the hearing decision became the final decision of the Commissioner of Social Security. On 11 June 2002, Whetstone filed the instant action (Doc. # 1).

## II. STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act ["the Act"], this court's role is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute our judgment

---

1. After reviewing the evidence, the ALJ determined that a hearing was not necessary (R. 222).

2. Dyspnea is defined as "difficult or labored respiration." *Webster's Medical Desk Dictionary* 197 (1986).

for that of the [Commissioner]." *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996) (citing *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983)).

This court's review of the Commissioner's decision is "limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, and whether the correct legal standards were applied." *Wilson v. Barnhart,* 284 F.3d 1219, 1221 (11th Cir.2002). Despite this limited review, the court is required to scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992). This court must find the Commissioner's factual findings conclusive if they are supported by substantial evidence. *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997).[3]

"In determining whether substantial evidence exists, [this court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan,* 936 F.2d 1143, 1145–46 (11th Cir.1991).

### III. DISCUSSION

**A. Standard for Determining Continuing Disability**

An individual who files an application for Social Security disability benefits must prove that she is disabled. *See* 20 C.F.R. § 416.912 (1999). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

If the claimant is entitled to disability benefits, the Commissioner is required to conduct a periodic review to determine whether those benefits should continue. *See* 20 C.F.R. § 404.1594(a). If there has been medical improvement related to the claimant's ability to work, the benefits cease. *Id.*

Medical improvement is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A decrease in severity determination must be based on improvements in the claimant's symptoms, signs or laboratory findings. *Id.*

The Social Security regulations provide an eight-step sequential evaluation process for determining if a claimant's disability continues. *See* 20 C.F.R. § 404.1594(f). First, the claimant must not be engaged in "substantial gainful activity." Second, it must be determined whether the claimant's severe impairment meets or equals the severity of a listed impairment. If the claimant's condition meets or equals the level of severity of a listed impairment, the claimant's disability continues.

If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the third step, namely, an assessment of whether there has been medical improvement of the claimant's condition. Fourth, if there

---

**3.** In *Graham,* the Court of Appeals stated that "substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 129 F.3d at 1422. *See also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

has been medical improvement, it must be determined if that improvement is related to the ability to do work.

If there has not been medical improvement, the examiner proceeds to the fifth step to determine whether any exceptions listed in 20 C.F.R. § 404.1594(d) and (e) apply. Sixth, if there has been medical improvement, it must be determined whether the claimant has a severe impairment or combination of impairments.

If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the seventh step, an assessment of the claimant's residual functional capacity ["RFC"]. The assessment measures whether a claimant can perform past relevant work despite his or her impairment. If the claimant is unable to do past relevant work, the examiner proceeds to the eighth and final step of the evaluation process to determine whether, in light of his or her RFC, age, education and work experience, the claimant can perform other work. § 20 C.F.R. 404.1594(f)(1)-(8).

This eight-step standard subsumes the substantial evidence analysis. In other words, this court must review the Secretary's final decision in terms of both the eight-step analysis *and* the substantial evidence standard. The appropriate inquiry is whether the Secretary's finding of improvement to the point of no disability is supported by substantial evidence.

*Chumbley v. Shalala*, 92–12VAL (RLH),1994 WL 774030, at * 3 (M.D.Ga. Nov. 22, 1994) (citations omitted); *see also Cagle v. Shalala*, CV–92–HM–2399–NE, 1994 WL 465824, at * 3 (N.D.Ala. May 10, 1994)

## B. The ALJ's Findings

Within the structure of the sequential evaluation process, the ALJ made the following findings:

1. The claimant has engaged in substantial gainful activity ["SGA"][4] since the last favorable decision (R. 36).

2. The claimant does not have an impairment or combination of impairments that meets or equals in severity one set forth in the Listing of Impairments (R.36).

3. The claimant has experienced medical improvement since the most recent favorable disability decision (R. 36).

4. The claimant's medical improvement is related to her ability to work (R. 36).

5. The claimant has the following medically determinable severe impairments: Dysthymic Disorder[5], chronic anxiety, exogenous obesity, status post sternotomy for stab wound to the chest—no sequela, and status post right carpal tunnel release (R. 36).

6. The claimant's subjective allegations are not credible (R. 36).

7. The claimant's retains the residual functional capacity to performed work within the limitations set forth in the Medical Source Opinion, dated October 11, 2000 (Exhibit B29), completed by Dr. Alan M. Babb, M.D. and in the Medical Source Opinion, dated October 30, 2000 (Exhibit B28), completed by Dr. Curry B. Hammack, Ph.D. In other words, the claimant can perform a range of light work (R. 36).

---

4. Substantial gainful activity is defined as work activity that involves doing significant physical or mental activities for pay or profit.

5. Dysthymic disorder is defined as "morbid anxiety and depression accompanied by obsession." *Webster's Medical Desk Dictionary* 197 (1986).

8. The claimant can return to past relevant work (R. 36).

9. The claimant is no longer disabled within the meaning of the Social Security Act (R. 36).

### C. Medical Improvement

Whetstone asserts that the ALJ erred in finding that her previously disabling impairments had medically improved (Doc. # 16). In order to find that Whetstone's condition has improved, the ALJ must compare original medical evidence and new medical evidence. *See Williams v. Apfel,* 73 F.Supp.2d 1325, 1337 (M.D.Fla.1999)(citing *Vaughn v. Heckler,* 727 F.2d 1040, 1043 (11th Cir.1984)).

The ALJ found that there had been medical improvement in Whetstone's impairments since the time of the most recent favorable decision. In the previous administrative review, the ALJ found that Whetstone suffered from severe impairments, including multiple stab wounds to the chest, residual ventricular septal defect, shortness of breath, dyspnea[6], dizziness and generalized anxiety disorder (R.218–225).[7] However, the second ALJ found that subsequent medical records as of 1998 failed to demonstrate ongoing heart problems (R. 31).

The evidence in the medical record supports this finding. On 11 October 2000, Dr. Alan Babb ("Dr.Babb"), a treating physician, performed an Internal Medicine Consultative Evaluation, a Range of Motion Examination and X-rays (R. 397–407). Whetstone's EKG showed "sinus bradycardia with a rate of 55 [and r]ight bundle branch block", but the cardiac examination revealed a normal heart rate and rhythm (R. 398). In addition, Dr. Babb noted that her heart was a normal size and shape (R. 406). Dr. Babb reported that Whetstone "has had no complications from her amazing recovery from stab wound to the chest in 1993. The cardiologists have found absolutely no complications or any cardiac problems to date." (R. 399).

On 27 April 1999, Whetstone reported to Dr. Patricia Gurczak ("Dr.Gurczak") that her chest pain had improved since she started taking Elavil and Motrin (R. 374). During a Consultive Examination conducted by Dr. Walter Pinson ("Dr.Pinson") on 2 June 1999, Whetstone denied "any exertional chest pain or discomfort" (R. 328). However, in a follow-up visit with Dr. Gurczak on 26 October 1999, she complained that she still had chest pain (R. 373). Dr. Gurczak reported continued chest wall pain, obesity, and mild left ventricular hypertrophy (R. 373). The cardiovascular exam showed a regular heart rate and rhythm without murmur, rub or gallop (R. 373). The ALJ noted that these complaints occurred after Whetstone was notified that her disability was being reviewed (R. 32).

In addition, Whetstone's physicians have not limited her activities (R. 32, 400–06). In fact, Dr. Gurczak suggested that she exercise (R. 373). As the ALJ noted, Whetstone has not had additional heart surgery since 1993 and there have not been any hospital emergency room visits and she is not taking any medications for her chest pains[8] (R. 32). Whetstone listed

---

6. Dyspnea is defined as "difficult or labored respiration." *Webster's Medical Desk Dictionary* 197 (1986).

7. Because Whetstone mental impairments were not found to have been severe in the first administrative hearing, the court will not apply the medical improvement analysis to its evaluation of her mental impairment.

8. Naproxen is defined as an "anti-inflammatory analgesic antipyretic drug … used esp. to treat arthritis." *Webster's Medical Desk Dictionary* 464 (1986). Amitriptyline is defined as a "tricyclic antidepressant." *Id*

her medications as Naproxen and Amitriptyline on 21 December 2000 (R. 421). The ALJ noted that Dr. Gurczak stopped prescribing Naproxen in March 1999 and that Whetstone did not take Amitriptyline as prescribed (R. 32, n. 7). Moreover, during a visit to Dr. Babb on 11 October 2000, Whetstone reported that she was not taking any medication (R. 397).

In further support of Whetstone's improvement, the ALJ noted that Whetstone has "demonstrated her ability to work by engaging in substantial gainful activity in years 1997, 1998 and 1999" (R. 30, 32). In fact, Dr. Babb questioned Whetstone as to why she believed that she was unable to work. Her response was that she was generally fatigued. Upon further questioning, Dr. Babb noted that she "continued to sit there and stare at me and say pretty much nothing." Eventually, she said that "she is just short of breath and tired." (R. 397).

▆ Based on the medical record, the court finds that substantial evidence supports the ALJ's finding that Whetstone's impairments medically improved in relation to her ability to work.

### D. Mental Retardation

Whetstone asserts that the ALJ committed error by failing to find that (1) she met the criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C) ["Listing 12.05(C)"] for a disability and (2) she is functioning in the mild range of mental retardation (Doc. # 16, pp. 3–9). Listing 12.05(C) describes the criteria to qualify for benefits for mental retardation:

Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder

is met when the requirements in A, B, C, or D are satisfied ...

. . . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.

Listing 12.05(C). The Court of Appeals has held that a claimant meets Listing 12.05(C), when the following are shown: 1) a valid I.Q. score of 60 to 70 inclusive; and 2) a physical or other mental impairment imposing additional and significant work-related limitation of function. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (finding that a claimant meets the criteria for presumptive disability under 12.05(C) by presenting evidence of the first two requirements).

To support his contention that he meets Listing 12.05(C), the claimant relies on the results from two I.Q. examinations conducted in 1999 and 2000 (Doc. # 16, p. 4). On 7 June 1999, licensed psychologist, Jean Badry ("Dr.Badry"), planned to administer the Wechsler Intelligence Scale–III ("WAIS–III") (R. 338). However, Dr. Badry did not perform the evaluation because Whetstone

> had difficulty keeping her eyes open and her head upright. It appeared she was somewhat sedated. She had slow verbal responses, avoidant in her answers and her voice was slurred. Her affect was very lethargic.

(R. 338). Dr. Badry was concerned that Whetstone's condition would have rendered the test invalid and the Disability Determination Office rescheduled the evaluation for 21 June 1999 (R. 338).

Whetstone returned on 21 June 1999 to take the WAIS–III:

> She had been asked not to take her pain medication at least 4 hours prior to the appointment. She was still quite lethargic with slowed cognitive processing and

**1324**

as well slowed physical movement. When asked how she was feeling, she responded "I need some medication." When specifically asked, she took her last pain medication "yesterday" but her demeanor suggested otherwise. Her motivation and persistence were initially poor and complicated by the apparent influence of an unknown substance.... Her speech became more slurred as the test progressed, however her subtest scores improved. Although the final IQ scores are identical with her previous [September 1993] scores, the subtest scores are quite different.

(R. 338–39). Dr. Badry reported that Whetstone obtained a verbal I.Q. of 60, a performance I.Q. of 63 and a full scale I.Q. of 58 (R. 339). She opined that Whetstone "should be able to respond appropriately to supervision and coworkers in a work setting" and live independently (R. 340).

On 9 October 2000, Dr. Curry Hammack ("Dr.Hammack"), a licensed psychologist, administered the ["WAIS–III"], resulting in Whetstone's attainment of a verbal I.Q. of 65, a performance I.Q. of 65, and a full scale I.Q. of 62 (R. 391–94). According to Dr. Hammack, the test results indicated Whetstone's functioning within the mild mentally retarded range of abilities (R. 393). However, the scores may have been "slightly depressed due to the need for encouragement as well as her lack of enthusiasm." (R. 393). Dr. Hammack noted that Whetstone "should be able to respond appropriately to supervisory figures" (R. 394). In addition, despite her history of functioning in the Borderline Range of development, she "should be able to handle low-skill level, labor-type work activities such as housekeeping." (R. 394).

In addition, the ALJ obtained the opinion of psychologist, Nancy Sack ("Dr. Sack") to testify at the administrative hearing (R. 68)[9]. After reviewing the medical record, Dr. Sack opined that Whetstone's three WAIS–III scores demonstrated

consistency, that would suggest that the most likely thing is that they're valid and to be accepted as true scores of how she performed on those tests. However, I'd like to point out her history of functioning. She worked for seventeen years ... her activities of daily living are normal ... [s]he takes care of her money herself. She read[s] the newspaper. She reads the Bible, which a pretty complex thing. She watches television. She does laundry, shopping, and goes to town ... [which] would suggest that her adaptive functioning is certainly much higher than mentally retarded.

(R. 69).

The ALJ found that Whetstone does not meet or equal the requirements for Listing 12.05(C):

No treating or examining source or medical expert has concluded otherwise....I note that, in 1993 and subsequent years, the claimant obtained IQ scores, which fall in the range of 58–65, and these appear to meet Listings 12.05B or 12.05C, in part. However, these listings also require that this level of cognitive functioning must have existed prior to age 22, together with deficits of adaptive functioning. These last two requirements are not present in this case. There are no IQ scores prior to age 22. Although the claimant contends that she took special education in school

9. Whetstone alleges that the ALJ's decision is primarily based on Dr. Sack's testimony (Doc. # 16, p. 6). However, the ALJ did not accord controlling weight to Dr. Sack; rather, the ALJ specifically articulated the reasons why he accorded weight to the testimony of Dr. Badry and Dr. Hammack (R. 33). Therefore, the court finds that this argument is without merit.

and completed only the 8th grade, school records do not fully support her contention. They show that in the 7th grade, she made an A- and a D in English and a B and C+ in Math. In the 8th grade, she made B's in English and Social Studies and D's in Math and Science. There is no evidence of special education placement. Although she left school in the 9th grade, this was not due to poor academic performance but pregnancy. Furthermore, I find that in spite of a lack of education, the claimant has lived a fairly normal life. She has been married twice and has raised one child to maturity. She worked for the same company for 16 or 17 years as a sewing machine operator. The vocational expert in this case testified that such work would require cognitive functioning in at least the borderline range of intelligence. Her activities of daily living suggest that she functions independently. She lives alone in a trailer that she pays for. She has control over her monies and pays her own bills. She possesses a driver's license and can drive a car. She cooks, takes care of her personal needs, and shops for groceries. . . . She has the ability, although limited to ability, to write, add and subtract, and multiply. Given this evidence, I do not find deficits in adaptive behavior.

(R. 31).

 A claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age of twenty-two, when she presents evidence of low I.Q. tests results *after* the age of twenty-two. *Hodges v. Barnhart,* 276 F.3d 1265 (11th Cir.2001). Absent evidence of sudden trauma that can cause retardation, the I.Q. tests create a rebuttable presumption of a fairly constant I.Q. throughout her life. *Id* at 1268. However, the Court of Appeals has held that a valid I.Q. score is not conclusive of mental retardation if the score is "inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery,* 979 F.2d at 837; *see Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).[10] Thus, the Commissioner may present evidence of the claimant's daily life to rebut the presumption of disability. *Hodges,* 276 F.3d at 1269.

In this case, the ALJ discounted Whetstone's I.Q. scores based on the analysis in *Popp* of the inconsistencies between those scores and Whetstone's daily activities and behavior. The ALJ considered the following: (1) There was no evidence of special education classes; (2) Whetstone made passing grades; (3) She left school in the 9th grade due to pregnancy, not poor academic performance; and (4) Her daily activities, i.e., driving, shopping, reading the Bible, handling her own bills, cooking and doing laundry. *See House v. Apfel,* No. 98–0885–P–L, 2000 WL 1368012 (S.D.Ala. Sept.6, 2000).[11] In addition, the ALJ con-

---

**10.** In *Popp,* the plaintiff had a two-year college associate's degree and was enrolled in his third year of college as a history major. He had previously taught algebra at a private school. In that case, the Court of Appeals held that the Listings for mental retardation do not require the Commissioner to make a finding of mental retardation based upon the results of an I.Q. test alone. However, the test results must be considered in conjunction with other medical evidence including the daily activities and behavior of the claimant. *Id.* at 1499.

**11.** In *House,* the court found that the ALJ's determination that the claimant failed to meet Listing 12.05(c) was supported by the evidence. The ALJ found that the claimant's test scores and the doctor's finding of borderline intellectual functioning were not supported by the evidence where the claimant had completed the eighth grade, worked the same job for 20 years, owned a home and car, had a driver's license, drover, cleaned the house, looked after her grandchildren, washed clothes, cooked every night, watched television, talked

sidered Whetstone's work history as a sewing machine operator for 17 years prior to her disability. "The regulations indicate, in the context of mental retardation, that an ability to hold a job is 'particularly useful in determining the individual's ability or inability to function in a work setting.'" *Williams v. Sullivan*, 970 F.2d 1178, 1184–86 (3d Cir.1992)(*quoting* 20 C.F.R. 404, Subpt. P, App. 1, § 12.00(D)) (despite claimant's I.Q. score of 66, the fact that claimant worked for twenty-two years at a steel drum factory refuted his claim of deficient intellectual functioning before age 22).

 Because the ALJ concluded from other evidence in the record that Whetstone's I.Q. scores are inconsistent with her actual intellectual functioning, the ALJ properly determined that Whetstone does not meet the first prong of section 12.05. The court is also mindful of the fact that, in the 1994 decision, the reviewing ALJ questioned the validity of the IQ test scores (R. 227) and did not find that Whetstone's mental impairments were severe or that they met Listing 12.05(C) (R. 224). Accordingly, the court finds that substantial evidence on the record supports the finding by the ALJ that Whetstone did not continue to satisfy the requirements for disability under section 12.05(C).

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED that this action is hereby AFFIRMED.

DONE this 3rd day of March, 2003.

## JUDGMENT

In accordance with the prior proceedings, opinions and orders of the court, it is

ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of the Commissioner and against Rosa Whetstone.

on the phone and visited with friends. *Id.* at * 8.